UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

========================================================================

THOMAS P. DOCKERY and
LISA C. DOCKERY,

       Plaintiffs,

v.                              1:07cv00144(NPM/DRH)

UNITED STATES OF AMERICA,

       Defendant.

========================================================================

| APPEARANCES | OF COUNSEL |
|---|---|
| Rusk, Wadlin, Heppner & Martuscello LLP<br>Attorney for Plaintiffs<br>255 Fair Street, P.O. Box 3356<br>Kingston, NY    12402 | Daniel G. Heppner, Esq. |
| Office of United States Attorney - Albany<br>Attorney for Defendant<br>445 Broadway, Room 218<br>Albany, NY     12207-2924 | Barbara D. Cotrell, Esq. |

NEAL P. McCURN, Senior U.S. District Court Judge

<u>MEMORANDUM - DECISION AND ORDER</u>

On the night of September 23, 2005[1], plaintiff Thomas Dockery

("Dockery") fell approximately ten feet off a vertical retaining wall, landed on

---

[1]     Despite testimony that the incident precipitating this lawsuit took place on
September 24, 2005, trial exhibits and the original complaint cite September 23, 2005 as the date
of the accident.

concrete below, and suffered serious injuries. This is an action brought by

Dockery and his wife, Lisa Dockery ("Lisa Dockery") (collectively, "plaintiffs")

pursuant to the Federal Tort Claims Act, codified at 28 U.S.C. § 2670 et seq,

against the United States of America ("defendant").  Defendant is the owner of the

property within the United States Military Academy at West Point, New York

("USMA"), specifically, the area known as Camp Buckner and the Landing Zone

("LZ") designated with the name Owl (heretofore, "LZ Owl") where plaintiff fell.

Plaintiffs allege that as a result of the wrongful and negligent conduct of the

defendant and its agents, servants and/or employees, Dockery fell off the

unmarked retaining wall at LZ Owl and suffered numerous injuries and permanent

disability.  Dockery claims damages for catastrophic personal injuries sustained on

the date of the accident, including fractures to L5 vertebral body superior endplate,

bilateral L2 and L3 transverse process fractures, right L4 transverse process

fracture, left T5 transverse process fracture and multiple rib fractures to left 4th

rib; left 5th rib; left 6th rib; left 7th rib; left 8th rib; left 9th rib; left 10th rib; left

11th rib; and left 12th rib, and a massive disc herniation at L5. Doc. No 30.  Lisa

Dockery claims damages for loss of consortium, comfort, support and society due

to injuries her husband sustained. Doc. No. 30.

     The court has subject matter jurisdiction over this matter pursuant to 28

U.S.C.A. § 1346(b)(1).  Venue is proper in this district because the plaintiffs reside in the Northern District of New York and because the incident complained of occurred in this district.

On June 16, 2009, a non-jury trial was held before this court.  Upon completion of the trial, the parties were directed to file findings of fact and conclusions of law, which have been received by the court.  Having reviewed the trial testimony and the parties' submissions, the foregoing constitutes this court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52.  For the reasons set forth below, judgment will be entered in favor of plaintiffs Thomas and Lisa Dockery against the defendant United States.  Accordingly, the court awards damages including past and future medical expenses, past and future pain and suffering to plaintiff Thomas Dockery and damages for loss of consortium to his wife, Lisa Dockery.

## I.    Facts[2]

Defendant, through  its agents, servants and/or employees, was the operator and organizer of a United States Army Paintball event known as "Big Game 2005

---

[2]    The following facts are taken from testimony at trial, and any references designated as "Tr. at __" are to the trial transcript, contained in Doc. Nos. 37, 38, 39 and 40. However, the first page of the transcript at Doc. No. 40 inexplicably reverts to Page 1. The court heretofore refers to Pages 1 through 87 of Doc. No. 40 as Pages 301 through 387 for the purpose of consistency and clarity.

Army Paintball Tournament," a semi- annual fundraiser for the West Point

Tournament Paintball Team (Tr. at 211), held at the USMA at West Point on

September 24, 2005.  Participants were charged an admission fee, and were

allowed to assemble the night before the Big Game and set up tents on the LZ Owl

segment of the property, adjacent to where the Big Game was to be held the

following day.

Dockery and his son Daniel arrived on site at between 5 p.m. and 6 p.m. on

the evening of September 23, 2005.  Daniel set up the tent in proximity to the tents

of his teammates, one of which was ten feet away, not knowing that the Dockery

tent was approximately six feet from the edge of the wall[3] where his father

subsequently fell. Tr. at 47-49.  While Daniel set up the tent, his father was

rearranging the supplies in the car.  Tr. at 63.  Later that evening, Dockery told his

son he was going for a walk.  Approximately 40 minutes later, Dockery tapped his

son on the shoulder and told him he fell.  Daniel took a flashlight and observed

that the back of Dockery's head was cut open and bleeding.  Daniel took Dockery

to the tent to lie down, where he remained for approximately two hours, drifting in

---

[3]     In his opening remarks, counsel for the plaintiffs posits that the concrete wall was constructed by the military and utilized over the years  for the purpose of target practice, with the "people whose job it was to put up the targets would work from down below the wall so that they would not be in harm's way." Tr. at 7.  Defendant offered no rebuttal, nor any other explanation or purpose for the wall.  As set forth below, the wall was bulldozed after the accident that precipitated this lawsuit.

and out of consciousness. Tr. at 51-53; 64; 85.  Dockery was then airlifted to a hospital for treatment of his injuries after a teammate summoned emergency help by dialing 911 on his cellular phone. Tr. 83-84.  Dockery's eyeglasses were subsequently found at the bottom of the ten-foot embankment (Tr. at 190) next to a puddle of blood. Tr. at 87.

Dockery also testified that he brought beer to the Big Game and had consumed a twelve ounce can of beer and half of another one before his fall. Tr. at 105. Dockery testified that shortly after he told Daniel he was going for a walk, he returned to his car to get a second beer.  He then walked behind the tent and fell. The next thing he knew, he was looking up at the sky from the bottom of the embankment, and the sky looked different to him.  He remembered lying there for a while and hearing music from the tents above, when it occurred to him that no one knew where he was.  He rolled over and crawled toward the wall. After feeling around in the darkness he realized he couldn't get back up that way, so he moved to the right and made his way back up to the top of the hill, crawling through thorn bushes and brush.  At that time, immediately after the fall, Dockery's major complaint was that he felt quite sick to his stomach. Tr. 113-16. As stated above, when Dockery reached the top of the embankment, he told his son that he fell, and Daniel helped his father to their tent. Tr. at 117.  At some

point after reaching the tent, Dockery remembered a cadet, whose name he couldn't recall, telling Dockery that he was going to be moved to a hospital, but Dockery told the cadet he didn't want to be moved because of the excruciating pain. Tr. 116-17.  Later that evening, rescue personnel arrived in response to the 911 call mentioned above.  A hole was cut in the side of the tent and Dockery was carried on a gurney to a waiting helicopter and airlifted to Westchester Medical where diagnostic tests were performed.  Dockery was told that he had a broken spine and several broken ribs.  He remained at the hospital for five days. Tr. at 119.  Dockery lost four months of work after the accident. Tr. at 123.  Dockery received full pay for approximately one month that he was out of work from vacation and sick days he had previously accrued.  Tr. at 127.  For the remaining three months, he received disability pay of approximately $130.00 per week.  Tr. at 144.  He was required to wear a custom made back brace for four months after his hospital release. Tr. at 132.

Prior to the accident, Dockery was in good physical condition.  He used to golf, ski, ride his motorcycle, work in the yard, move rocks, mow lawn and shovel snow. Tr. at 15.  Dockery, Lisa Dockery and their sons also biked, kayaked, and ice skated in winter Tr. at 155.  Dockery enjoyed swimming, hiking, camping, and skiing with his family.  Dockery played hockey three times a week over a period

6

of twenty years.  He had been paintballing with his sons for approximately ten years.  He also exercised, lifted weights, and did pushups to keep himself in good shape. Tr. 95-96; 99.  Dockery also maintained the yard and pool, and remodeled his older home by replacing windows and installing sheetrock, as well as helping around the house with cleaning, washing dishes, etc.  After the September 2005 accident, Dockery testified that he was too tired and in too much pain after work to engage in these activities. Tr. at 99.  Dockery tried to ride his motorcycle after the accident, but found that he was unable to hold the bike up due to lack of strength in his left leg. Tr. at 132.  Lisa Dockery testified that since the accident, their social life has suffered.  Friends no longer visit, as Dockery is exhausted after work and is usually asleep by 8:00 p.m., and is too tired to even go to a movie. Tr. at 156.

Dockery testified that prior to the accident, he had no trouble sleeping, but since the accident, he has trouble sleeping through the night due to discomfort and pain. Tr. at 138.  Lisa Dockery testified that when Dockery wakes up in the night from the pain, her own ability to sleep suffers. Tr. at 157.  She also testified that due to the accident, the couple's intimate relationship has diminished to next to nothing. Tr. at 158.

## II.    The Federal Tort Claims Act (FTCA) generally

"The United States enjoys sovereign immunity; it cannot be sued without its consent, and such consent is a prerequisite for jurisdiction." See United States v. Navajo Nation, 537 U.S. 488, 502 (2003). "Congress has given limited consent to suit in the FTCA, which does not create new causes of action, but only waives immunity under circumstances that would create liability 'in the same manner and to the same extent as a private individual under like circumstances.'" Dorking Genetics v. United States, 76 F.3d 1261, 1266 (2d Cir.1996) (quoting 28 U.S.C. § 2674). To satisfy the elements of the FTCA, a claim must be:

> [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Id. at 1264 (quoting F.D.I.C. v. Meyer, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)).

"The Second Circuit has indicated that the FTCA: [w]aives the United States's sovereign immunity for certain classes of torts claims and provides that the federal district courts shall have exclusive jurisdiction over damages claims against the United States for injury or loss of property, or for personal injury or death 'caused by the negligent or wrongful acts or omission of any employee of

the Government while acting within the scope of his office or employment.' 28

U.S.C. § 1346(b)(1). The FTCA's purpose is both to allow recovery by people

injured by federal employees or by agents of the Federal Government, and, at the

same time, to immunize such employees and agents from liability for negligent or

wrongful acts done in the scope of their employment." <u>Celestine v. Mount Vernon</u>

<u>Neighborhood Health Ctr.</u>, 403 F.3d 76, 80 (2d Cir.2005).  "Under the FTCA, the

liability of the United States for the negligence acts of its agents is governed by

the law of the state in which the alleged negligence occurred." <u>Gerace v. U.S.</u>,

2006 WL 2376696 (N.D.N.Y. 2006)**.**  In other words, "the court [should] apply the

substantive law of the place where the events occurred." <u>Giordano v. U.S.</u>, 2009

WL 1362979 (N.D.N.Y. 2009) (<u>citing</u> <u>Castro v. United States</u>, 34 F.3d 106, 110

(2d Cir.1994)).

## III.   **Negligence / Duty To Warn / Reasonable Care**

"Under New York law, the elements of a negligence claim are: (i) a duty

owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury

substantially caused by that breach." <u>Lombard v. Booz-Allen & Hamilton, Inc.</u>,

280 F.3d 209, 215 (2d Cir. 2002).  In this state, "negligence is defined as conduct

which falls 'below that of a reasonably prudent person under similar circumstances

judged at the time of the conduct at issue.' Thus, a plaintiff who asserts a

9

negligence claim against the United States pursuant to the FTCA 'must prove by a preponderance of the evidence that: (1) the Government owed a duty to [him or her]; (2) the Government breached that duty by its negligent conduct; and (3) as a result of that breach, plaintiff suffered injury.'" Rambert v. U.S., 1996 WL 583392 (S.D.N.Y. 1996) (internal cites omitted).

"With regard to premises liability, New York has adopted a single standard of liability, requiring an owner to maintain reasonably safe conditions in view of all the circumstances 'including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.'" Id. "The question of whether a hazard is open and obvious is normally one that goes to the [trier of fact] unless only one possible conclusion may be drawn from the undisputed facts." Tuthill v. U.S., 270 F.Supp.2d 395, 399 (S.D.N.Y. 2003) (citing Pelman v. McDonald's Corp., 237 F.Supp.2d 512, 541 (S.D.N.Y.2003)).

In New York, "it is well settled that a landowner has a duty to exercise reasonable care in maintaining his own property in a reasonably safe condition under the circumstances. The nature and scope of that duty and the persons to whom it is owed require consideration of the likelihood of injury to another from a dangerous condition on the property, the seriousness of the potential injury, the burden of avoiding the risk and the *foreseeability of a potential plaintiff's presence*

10

*on the property*." <u>Furey v. U.S.</u>, 458 F.Supp.2d 48, 53 (N.D.N.Y. 2006) (emphasis in original).  In addition, under New York law,

> Generally, ***a party who, in possession of premises, throws them open to the public for the purpose of gain***, impliedly warrants the premises to be reasonably safe for the purpose intended, and is under a legal duty to exercise due care, commensurate with the circumstances, to put and maintain the premises, instrumentalities, and all parts thereof to which persons lawfully present may go, in a safe condition for the uses for which they are intended and designed.

85 NY Jur. 2d Premises Liability § 36 (West 2009) (emphasis added).

Here, the court finds that the unprotected wall constituted an unsafe condition.  The court finds that the defendant opened the LZ Owl premises for gain, i.e., for a fundraising event to benefit the West Point Paintball Team, and consequently, failed to meet its obligation to ensure that the premises were reasonably safe for the purpose intended.  One cadet, who was tasked with assisting in registration of the paintball players, had previous knowledge of the dangerous wall at the edge of LZ Owl from training exercises prior to the 2005 Big Game. Tr. at 332.  Lt. Shaun Gilbert testified that the drop-off was "pretty visible" ... "[a]nd obviously when an individual tented on LZ Owl or camped on LZ Owl, if they were close to the area, they could see the drop-off."  Gilbert also testified that he did not think that the ledge was "substantial." Tr. at 256.  Gilbert

11

was aware of the existence of the wall, but when asked if it would have been part of his job to warn campers that there was an 8 to 10 foot wall behind their tents, Gilbert replied, "No, sir, that was not part of my job." Tr. at 283.

Despite Gilbert's testimony that the wall was visible and easily seen, it was not apparent to Major McLean, who drove around LZ Owl looking for hazards prior to the Big Game, and viewed the area of the wall from approximately 120 feet away. (Tr. at 332). McLean testified that "the wall was not visible ... [a]t the angle I was looking at, I did not see the wall because the vegetation of the trees looked like it was on the same level as the ground." Tr. at 341. When plaintiff's counsel asked if it looked like that these were simply woods at the end of the field, McLean replied, "From the truck, yes." At trial, the wall was not readily visible to the court or easily seen when the court examined the photographs taken in daylight at the LZ Owl site, and did in fact look like woods at the end of a field.

At trial, the defendant clearly indicated that it attempted to make secure both the paintball field and the camping area on LZ Owl, to ensure both were free of hazards. The court also has reason to believe that had the proper agents and/or employees of the defendant known about the hazardous condition caused by the sheer drop beyond the wall, the necessary steps to protect the individual campers from danger would have been taken. In fact, Major McLean testified that upon

12

learning of the existence of the wall after Dockery fell off and was injured, West

Point personnel took several precautions to ensure no one else would fall off the

wall, including marking the wall with engineer's tape and placement of chemical

lighting, and instructing campers to move their tents away from the wall. Tr. at

317.  In addition, counsel for both parties stipulated to the fact that shortly after

the incident, plaintiffs were unable to inspect the site because the wall had been

taken down. Tr. at 199.  However, Lt. Gilbert did know of the existence of the wall

through his own previous training at the site, and because LZ Owl was an active

training area, the court holds that defendant should have known of a three hundred

foot wide, ten foot high wall adjacent to an area designated as a camping area of

the Big Game.  As set forth above, under the law of New York, when the

defendant opened the premises to the public for the purpose of gain, it impliedly

warranted the premises to be reasonably safe for the purpose intended.

Accordingly, the defendant was under a legal duty to exercise due care, the

defendant breached that duty by its negligent conduct, and as a result of that

breach, Dockery suffered serious injury.

## IV.   Comparative Negligence

Defendant argues that to the extent it is found negligent, any amount of

damages recoverable by plaintiffs must be diminished in proportion to the

culpable conduct attributable to the plaintiffs.  In 1975, New York adopted a comparative negligence statute, which provides:

> In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

N.Y. C.P.L.R. § 1411 (West 2009).

Assumption of the risk is either express or implied. "Express assumption of the risk ... [is defined as] an 'agreement in advance that defendant need not use reasonable care for the benefit of plaintiff and would not be liable for the consequence of conduct that would otherwise be negligent.' " Integrated Waste Services, Inc., 113 F.3d 296, 301 (2d Cir. 1996).  "Implied assumption of the risk may exist when a plaintiff voluntarily encounters a risk emanating from a defendant's conduct with a full understanding of the possible harm to himself and unreasonably consents to the risk under the circumstances." Furey v. U.S., 458 F.Supp.2d 48, 55 (N.D.N.Y. 2006).  In the case at bar, Dockery has shown that he was not aware of the existence of the wall and drop-off behind his tent. Consequently, assumption of the risk, as set forth in Furey, does not apply here.

"[P]laintiffs owe themselves a duty 'to recognize obvious hazards and exercise the appropriate level of caution.'" Furey at 55.  "When they fail to do so, New York's comparative negligence statute splits liability between plaintiffs and defendants based on their relative culpability and the causal significance of their conduct." Id.  In the case at bar, the defendant raises the following issues in contending that Dockery was at entirely at fault for his fall over the embankment. First, defendant argues that Dockery introduced alcohol into the equation by having at least one and a half beers the night of the accident. Second, defendant argues that Dockery was at fault for not using his flashlight to navigate (Tr. at 141-42), and finally, that the wall and drop-off were obvious and easily seen, and that any injury sustained by Dockery was caused in whole or in large part by his own activities and his own inattention. Tr. at 385.  The court is not persuaded, and finds that the defendant has not met its burden of proof for comparative negligence.

The defendant has offered no proof that alcohol played any part in Dockery's fall over the unmarked wall.  In fact, the only credible testimony on this issue is Dockery's own, whereby he freely admits that he had finished one beer and was starting on a second one when the accident happened.  But for this admission, defendant has offered no proof whatsoever that Dockery was drinking

15

alcohol that evening.  Empty beer cans located in a field where campers prepare

for the "Big Game" the following day are not sufficient circumstantial evidence

that  Dockery consumed any greater amount of beer than that to which he has

testified, and the defendant has offered no evidence that Dockery was impaired in

any manner.

Regarding the issue of Dockery not using any type of illuminating device as

he was walking around his campsite, the court notes testimony by Major McLean

that upon hearing of Dockery's fall, he and a cadet rushed to the scene, but didn't

need a flashlight as there were propane lanterns from other tents illuminating the

area.  Tr. at 319.  The court cannot find that it was necessary for Dockery to

believe he needed to utilize a lantern when it was not necessary for agents of the

defendant to do likewise.  Finally, the court addresses the issue of whether the

wall was an obvious hazard that Dockery should have known was there and

avoided.  The court heard much testimony on this issue, and finds that only one

person testified that he was aware of the hazard of the wall and the sheer drop

behind it.  As stated supra, Lt. Shaun Gilbert learned of the existence of the wall

during training exercises, and testified that it was not his duty to notify anyone of

its existence.  That sentiment was later contradicted by Major McLean, who, when

asked by plaintiffs' counsel, "And were your, the people under you, the various

cadets, also responsible for making sure that the civilians that were invited there were safe?", answered "Correct."  Tr. at 328.  As stated above, Major McLean testified that he made two daylight passes around LZ Owl with his pickup truck in search of hazards and did not see the wall or the drop behind it, yet the defendant argues unconvincingly that Dockery should have seen it in the dark.  Accordingly, the court finds no comparative negligence on the part of Dockery.

**V.     Damages**

In New York, "[a] plaintiff who has been injured by another's negligence is entitled to a sum of money that will "justly and fairly" compensate [him] for all losses proximately caused by the wrongdoing, to restore [him], to the extent possible, to the position [he] would have been in had the wrong not occurred. NYPJI 2:277." Kane v. U.S., 189 F.Supp.2d 40, 52 (S.D.N.Y. 2002) (citing McDougald v. Garber, 73 N.Y.2d 246, 538 N.Y.S.2d 937, 939, 536 N.E.2d 372 (1989)).  "Recovery for noneconomic losses such as pain and suffering and loss of enjoyment of life rests on 'the legal fiction that money damages can compensate for a victim's injury.' We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong." Kane, 189 F.Supp.2d at 52-3. Having concluded that the defendant's acts and/or omissions were the sole cause

of Dockery's injuries, the court is now "in the unenviable position of calculating damages ...  the court notes that reaching a number amount in damages is an extremely difficult decision; yet, the court must quantify [the plaintiff's] pain and suffering." Testaverde v. U.S., 2009 WL 1456533 at * 12 (E.D.N.Y. 2009).

A.    Pecuniary Damages

"Once a plaintiff establishes negligence as the proximate cause of [his] injuries, [he] is entitled to recover "a sum of money which will justly and fairly compensate ... [him] ... for the loss resulting from the injuries sustained." Furey, 458 F.Supp.2d at 56. "Generally, damages are categorized as either pecuniary or non-pecuniary. Pecuniary damages assess the economic consequences of an injury and include medical expenses, lost earnings and the cost of care." Id.

1.    Loss of Income

"Under New York law, an award for loss of income must be established to a reasonable certainty given the plaintiff's earning capacity both before and after the accident giving rise to the suit ... Such an award cannot be based on mere conjecture alone." Carroll v. U.S., 295 FedAppx. 382, 384 (2d Cir. 2008).  Here, plaintiffs have shown that Dockery suffered lost wages in three of the first four months after his accident, but he was then able to summon the determination to return to work despite the pain he was experiencing.  The amount of lost wages is

the difference between Dockery's regular salary less the amount he received in disability payments. Accordingly, the court will award said amount to Dockery pursuant to the parties agreement on a sum certain, i.e., the difference between Dockery's salary and the amount he received in disability benefits. Plaintiffs have not proven to the court that there exists a reasonable certainty of future lost wages, and in fact, Dockery has continued to work in the same profession as before the accident. Despite the fact that Dockery cannot perform his duties at the same level he was performing at prior to the accident (Tr. at 124-25), except for the three month period of time addressed supra, his level of income has in fact increased since the date of the accident.

Dockery's Form W-2s show his income in the relevant years as follows:

| | | |
|---|---|---|
| 2004[4] | Shoprite Supermarkets, Inc. | $54,400.72 |
| | Town of Rosendale | $ 965.00 |
| 2005[5] | Shoprite Supermarkets, Inc. | $44,414.65 |
| | Town of Rosendale | $ 955.00 |
| | Disability Benefits | $ 2,074.00 |

---

[4]     Plaintiff's Trial Exhibit No. 14

[5]     Plaintiff's Trial Exhibit No. 15

19

2006[6]        Shoprite Supermarkets, Inc.        $56,897.76

               Town of Rosendale                  $ 1,498.68

In addition, testimony regarding Dockery's retirement date, i.e., that he will

retire at an earlier age than he intended prior to the accident, is largely conjecture.

See, e.g., Plaintiff's Exh. 27, Deposition of Stuart W. Sachnin, page 64.  Sachnin,

a vocational economic analyst (id. at page 5), gave his opinion that on a continuum

of someone who is non-disabled to someone who is severely disabled, with

average disabled in the middle, Dockery falls somewhere between non-disabled

and average disabled. Id. at page 69-70.  The court does not find Dockery's

retirement at an earlier age due to his injuries to be a certainty.  Accordingly, the

court disallows Dockery's claim for future lost wages.

## 2.        Past and Future Medical Expenses

Dockery has sustained out-of-pocket medical expenses as a result of the

accident.  Some of these expenses were covered by insurance, but some were not.

Dockery sustained $ 39,800.00 in medical expenses, with $11,504.66 paid by his

HMO coverage though GHI.  At trial, Dockery's counsel stated to the court that he

would make an attempt to negotiate a settlement regarding the medical expenses,

to get the providers to accept less and "knock off the attorney's fees from that." Tr.

---

[6]        Plaintiff's Trial Exhibit No. 16

at 125-26.  Accordingly, the court awards medical expenses above and beyond what was paid by Dockery's HMO coverage.  In addition, based on the evidence before it, the court finds that it is likely that Dockery will require additional medical procedures in the future.  Because these expenses are speculative, the court will award $55,000.00 for future medical expenses, the amount quoted as sufficient to cover Dockery's back surgery, i.e., $50,000.00 to $60,000.00 (Plaintiff's Exh. 19, Deposition of Jack Stern, M.D., page 35), should Dockery choose to have it performed.  Should Dockery not elect to have the surgery, the amount awarded will assist Dockery in the event he will need physical therapy or other rehabilitative procedures and/or pain relief.

      B.     Non -Pecuniary Damages

"[A] district court reviews the evidence presented at trial in support of the challenged damage award and compares the award to other New York cases in which evidence of similar injuries was presented." Presley v. U.S. Postal Service, 317 F.3d 167, 173 (2d Cir. 2003) (citing  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 437-39 (1996).  "When determining a pain and suffering award, it is appropriate for the Court to review awards in comparable cases." Kolerski v. U.S., 2008 WL 4238924 at * 5 (W.D.N.Y. 2008) (citing Furey, 458 F.Supp.2d at 56).

        1.     Past and Future Pain and Suffering

Dockery has testified about the excruciating pain on the night of the accident, the pain he suffered throughout his hospital stay and subsequent recuperation, and the continuing pain he suffers to this day.  Dockery, his wife, and his son all testified regarding Dockery's prior enjoyment of life and the litany of activities that he can now no longer enjoy.  In New York, "pain and suffering includes the loss of the enjoyment of life which compensates for the frustration and anguish caused by the inability to participate in activities that once brought pleasure." Furey, 458 F.Supp.2d 48, 56.  However, an award for loss of enjoyment of life is not permitted separate from an award for pain and suffering. Carroll v. U.S., 295 Fed.Appx. at 386.

The defendant argues against an award for pain and suffering because Dockery treats his pain with over the counter painkillers and is not currently under a doctor's care for pain, nor does he participate in any type of physical therapy for his pain.  In addition, defendant also points out that Dockery has not undergone surgery to correct the problems with his back. Doc. No. 44 at page 17.

The court finds that "[p]ain is subjective. Given the level of pain that the patient is suffering, the patient's own pain threshold, the risks and possible benefits of an operation, and the pain of surgery, there is nothing odd about someone waiting years before undergoing elective orthopedic surgery." Hathaway

v. Coughlin, 37 F.3d 63, 69 (2d Cir. 1994 (Jacobs, J, dissenting).

Accordingly, the court must determine an amount to compensate Dockery both for his past and future pain and his "frustration and anguish caused by the inability to participate in activities that once brought pleasure" as articulated in Furey, supra.  For that, the court must "compare[] the award to other New York cases in which evidence of similar injuries was presented."  Presley, 317 F.3d at 173.

In a slip-and-fall accident in the Western District of New York, the plaintiff suffered back injuries, and as in the case at bar, was able to return to work absent heavy lifting.  That plaintiff was advised by treating physicians that while plaintiff would need spinal surgery in the next five to fifteen years, neither physician recommended the surgery. Robinson v. U.S., 330 F.Supp.2d 261, 294 (W.D.N.Y. 2004).  In Robinson, the court compared several court cases awarding compensation for pain and suffering, and based on those awards, concluded that the plaintiff should be awarded $50,000.00 for past pain and suffering, and $200,000.00 for future pain and suffering (reduced by that plaintiff's 20% comparative negligence). Id. at 297.

In <u>Kane v. U.S.</u>, the court wrote that "Kane's[7] life has been shattered because a Postal Service employee driving a two and a half ton truck failed to look carefully as he made a turn ... Far from being a malingerer, she has worked hard to be 'productive' again." 189 F.Supp.2d at 54.  The court awarded Kane non-economic losses consisting of past injuries, conscious pain and suffering, and loss of the enjoyment of life in the amount of $700,000.00, and future injuries, conscious pain and suffering, and loss of enjoyment of life, in the amount of $500,000.00.

In <u>Goldstein v. U.S.</u>, the court awarded $450,000.00 for past pain and suffering and $230,000.00 for future pain and suffering to a victim of a bizarre accident which occurred when the vehicle in which she was riding was struck by two five-ton United States Army tractor-trailer trucks. 9 F.Supp.2d 175, 177, 193 (E.D.N.Y. 1998).  In that case, Mrs. Goldstein suffered multiple severe fractures to the right side of her body (id. at 179) and was admitted to the hospital for surgery, where she remained for twelve days.[8] <u>Id.</u>

---

[7]    Ms. Kane was 36 years old at the time of the accident in 1997, which left her with severe injuries and fully disabled from the time of the accident until date of the court's order in 2002.  189 F.Supp.2d at 48.

[8]    Mrs. Goldstein suffered from fractures of the right arm and shoulder, the right knee and leg, and the right foot, and at the time of trial was unable to walk without a cane.  The court found that she would require physical therapy for life and would require knee replacement surgery.  In that case, the total award totaled $965,000.00. <u>Goldstein v. U.S.</u> at 193-94.

After she was released from the hospital, Mrs. Goldstein was directly admitted to a rehabilitation center where she remained for five weeks and engaged in physical therapy twice a day. Approximately one month later, she returned to the center for an additional one-month stay. Id. at 182.    In the case at bar, the court has compared the facts of Dockery's case to the facts of Robinson, Kane and Goldstein, and the relevant court cases therein, to find that Dockery is entitled to an award of $400,000.00 for past pain and suffering, and loss of enjoyment of life. In addition, Dockery must live with the aftermath of the accident and the pain and reduced quality of life to which he testified at trial, and should not be penalized for an early return to work, despite his pain, in an attempt to be productive and to provide for his family. Accordingly, the court awards Thomas Dockery $200,000.00 for future pain and suffering, and loss of enjoyment of life.

The award for future pain and suffering must be reduced to its present value. See Estevez v. United States, 72 F.Supp.2d 205, 211, 214 (S.D.N.Y. 1999) (In a FTCA case, reducing damages awards for future pain and suffering by a discount rate of 2% per year, for a maximum of ten years pursuant to New York law); see also N.Y. C.P.L.R. 5041(e) ("[T]he period of time used to calculate the present value for damages attributable to pain and suffering shall be ten years or the period of time determined by the trier of fact, whichever is less.") Accordingly, the

parties are instructed to discount the award for future pain and suffering by 2%

over the period of ten years, and reflect the sum on the order of judgment to be

submitted to the court.

> 2.    Loss of Consortium / Lisa Dockery

Lisa Dockery is seeking an award for $500,000.00 for loss of consortium

due to her husband's accident and subsequent disability. Various New York courts

have address the common-law claim of loss of consortium.  "It is well settled

under New York law that a claim for loss of consortium "is a derivative action

and, as such, its viability is dependent on the viability of a primary cause of

action...." Jones v. U.S., 408 F.Supp.2d 107, 126 (E.D.N.Y. 2006); Panczykowski

v. Laborers International Union of N.A., 2000WL387602 (W.D.N.Y. 2000)

(quoting Stander v. Orentreich, 165 Misc.2d 530, 627 N.Y.S.2d 879, 884

(App.Div.Dep't.1995)).  Here, because the court has found for Dockery on the

primary claims, Lisa Dockery's derivative claim has survived.

"The cause of action for loss of consortium is designed to 'compensate for

the injury to th[e marital] relationship' and to 'the interest of the injured party's

spouse in the continuance of a healthy and happy marital life ... An award for loss

of consortium may include components for both the past and the future."

Rangolan v. County of Nassau, 370 F.3d 239, 248 (2d Cir. 2004) (internal

citations omitted).  "Consortium represents the marital partner's interest in the continuance of the marital relationship as it existed at its inception." <u>Buckley v. National Freight, Inc.</u>, 90 N.Y.2d 210, 213-214, 659 N.Y.S.2d 841, 681 N.E.2d 1287 (1997).  "A loss of consortium claim embraces what the non-injured has lost; it covers the loss of support and services provided by the injured spouse as well as such elements as love, companionship, affection, society, sexual relations, and solace." <u>Zavaglia v. Sarah Neuman Center for Healthcare and Rehabilitation</u>, 883 N.Y.S.2d 889, 893 (N.Y.Sup.2009) (internal citations omitted).  "Although there is no [explicit] evidence that [the spouse] lost companionship or society due to the injuries allegedly sustained, that loss 'can be reasonably inferred from the state of marriage itself.'" <u>Rangolan v. County of Nassau</u>, 370 F.3d at 248.

The court must now look to case law to find an appropriate award.  In <u>LaMarca v. U.S.</u>, the court awarded $5,000.00 to a widow for the 4-month period between a husband's fall and his death from that fall. 31 F.Supp.2d 110, 132-3-33 (E.D.N.Y. 1998).  In <u>LaMarca</u>, the decedent suffered from osteoporosis and severe arthritis and was in extremely poor health prior to his last hospitalization, hence the low award. <u>Id.</u> at  125.  In <u>Goldstein v. U.S.</u>, set forth <u>supra</u>, the court awarded $50,000.00 to the husband of accident victim Goldstein.  The court found that "$50,000 balanced the lack of quality leisure time the Goldstein[']s shared prior to

the accident, with the recognition of the many domestic chores Francine Goldstein did, but can no longer do, to keep the house, and the benefits that Allen Goldstein derived from those pre-accident efforts." 9 F.Supp.2d at 193-94.

In Battista v. U.S., 89 F.Supp 716 (S.D.N.Y. 1995), the court awarded $10,000.00 for loss of consortium.  Mrs. Battista cared for her husband in the first four months after his accident.  The court noted that "[n]either Mrs. nor Mr. Battista testified that their love and affection for each other had diminished after the accident," nor did the Battistas expend any money to have household chores performed. Id. at 729.

Based on consideration of the aforementioned cases and the facts of this case, the court awards Lisa Dockery $40.000.00 for loss of consortium due to her husband's injury.

C.    Attorneys' Fees

Pursuant to 28 U.S.C. § 2412(d)(1)(A), plaintiffs cannot recover attorney's fees from the defendant.  Attorney's fees must be taken from any judgment or settlement and pursuant to 28 U.S.C. § 2678 are limited to twenty-five per cent (25%) of such judgment or settlement.

Section 2412 (d)(1)(A) reads as follows:

Except as otherwise specifically provided by statute, a court shall

award to a prevailing party other than the United States fees and other
expenses, in addition to any costs awarded pursuant to subsection (a),
incurred by that party in any civil action (other than cases sounding in
tort), including proceedings for judicial review of agency action,
brought by or against the United States in any court having
jurisdiction of that action, unless the court finds that the position of
the United States was substantially justified or that special
circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (West 2009).

Attorney fees under the FTCA are regulated pursuant to 28 U.S.C. § 2678,

which states that "[n]o attorney shall charge, demand, receive, or collect for

services rendered, fees in excess of 25 per centum of any judgment rendered

pursuant to section 1346(b) of this title [United States as a defendant] or any

settlement made pursuant to section 2677 of this title in excess of 20 per centum of

any award, compromise, or settlement made pursuant to section 2672 of this title."

28 U.S.C. §2678 (West 2009).  Accordingly, the attorney's fees should come out

of the judgment awarded pursuant to the bench trial, and the court will not assess

attorney fees in this order.

D.     Pre-judgment and Post-judgment interest

Pursuant to 28 U.S.C. § 2674, plaintiffs are proscribed from recovering pre-

judgment interest against the defendant. Section 2674 states that "[t]he United

States shall be liable, respecting the provisions of this title relating to tort claims,

29

in the same manner and to the same extent as a private individual under like

circumstances, but shall not be liable for interest prior to judgment or for punitive

damages." 28 U.S.C. §2674 (West 2009).  Accordingly, no prejudgment interest

will affix to the damages award set forth supra.

Post-judgment interest will accrued from the date of this order, barring an

appeal by the plaintiffs,  pursuant to 31 U.S.C.A. § 1304, which states in pertinent

part that "[i]nterest may be paid from the appropriation made by this section-- (A)

on a judgment of a district court, only when the judgment becomes final after

review on appeal or petition by the United States Government, and then only from

the date of filing of the transcript of the judgment with the Secretary of the

Treasury through the day before the date of the mandate of affirmance ...." 31

U.S.C.A. § 1304 (b)(1)(A) (West 2009).  Interest will be calculated pursuant to 28

U.S.C.A. § 1961.

## VI.    Conclusion

For the reasons stated above, the court hereby awards plaintiff Thomas

Dockery his past medical expenses, a specific sum to be negotiated and

determined by the parties, as set forth supra, and the sum of $55,000.00 for future

medical expenses.  The court awards Thomas Dockery $400,000.00 for past non-

economic losses including pain and suffering, and loss of enjoyment of life, plus

an award of $200,000.00 for future pain and suffering and loss of enjoyment of life, to be discounted by 2% to reflect its present value.  Postjudgment interest will accrue at the prevailing federal rate until the damages awarded are paid.

The court awards Lisa Dockery the amount of $40,000.00 for loss of consortium pursuant to the laws of New York State, plus postjudgment interest accruing at the prevailing federal rate until the damages awarded are paid .  The parties are directed to submit a joint proposed judgment for the court's signature within 30 days of this Order.

SO ORDERED.

October 8, 2009

_____

Neal P. McCurn
Senior  U.S. District Judge